

FILED
IN OPEN COURT

MAY 1 4 2012

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 2:12cr64 |
| | ) | |
| v. | ) | |
| | ) | |
| RECARDO S. LEWIS, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in the criminal information and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt, by proof of the following facts, among others:

1. Tivest Development & Construction, LLC ("Tivest"), headquartered in Virginia Beach, Virginia, was a residential and commercial developer.

2. The Bank of the Commonwealth (the "Bank"), headquartered in Norfolk, Virginia, was the sole business of Commonwealth Bankshares, Inc., whose securities were traded on the Nasdaq Stock Exchange under trading symbol "CWBS." The Bank's deposits were insured by the Federal Deposit Insurance Corporation.

3. Starting in September 2008, the Bank's regulators, the Federal Reserve Bank of Richmond (the "Federal Reserve") and the Virginia State Corporation Commission ("VSCC"), expressed concerns about the way the Bank managed risk and underwrote loans. In or about November 2008, the Bank sent to the Federal Reserve an application requesting approximately $28 million from the Trouble Asset Relief Program ("TARP"). Given concerns about the health of the Bank, the Federal Reserve later requested that the Bank withdraw its TARP application –

which the Bank did. On or about March 19, 2010, the Federal Reserve issued a report from its September 2009 examination of the Bank that concluded the overall financial condition of the Bank had deteriorated to an unsafe and unsound condition. The Federal Reserve noted its particular concern regarding numerous practices that management used to mask the past due status of loans, including extending new loans so that borrowers could pay on existing loans.

4. On or about March 5, 2010, Tivest obtained a $4,111,000 loan from the Bank to purchase property and complete construction of an 8-unit condominium project located at 310 24th Street in Virginia Beach, Virginia. The property cost $2,075,000, but the Bank approved an additional $2,036,000 for construction costs and interest carry on the loan.

5. The loan was guaranteed by Conspirator A.

6. RECARDO LEWIS was employed by Tivest as the project manager for the 24th Street condominium project.

7. From in or about March 2010 through in or about October 2010, at Conspirator A's direction, RECARDO LEWIS signed and submitted eight fraudulent construction draw requests to the Bank. RECARDO LEWIS and Conspirator A submitted these draw requests to obtain loan proceeds for costs purportedly incurred developing and constructing the condominium project.

8. As support for each draw request, RECARDO LEWIS prepared a spreadsheet detailing the work purportedly completed. These spreadsheets inflated the amounts owed contractors and included costs for work that was not completed.

9. RECARDO LEWIS also attached falsified mechanics' lien waivers to the draw requests submitted to the Bank. Many of the contractors that worked at 24th Street signed blank lien waivers at the start of the project. At the direction of Conspirator A and RECARDO

2

LEWIS, a Tivest employee would later complete the lien waivers by referring to the inflated figures contained in the spreadsheets to fill in the amount owed each contractor.

10. An architect also signed each fraudulent construction draw request certifying that work consistent with the amount of the draw request had been completed. The conspirators did not provide to the architect the spreadsheets detailing the project expenditures. Instead, before each draw request, RECARDO LEWIS accompanied the architect on his inspection of the construction site and simply pointed out any new work completed.

11. On or about March 5, 2010, at Conspirator A's direction, RECARDO LEWIS submitted to the Bank a fraudulent construction draw request for $117,000. This draw request contained numerous false entries. For example, the spreadsheet attached to this draw request indicated that $52,000 was spent to purchase materials for an elevator. However, the conspirators never purchased an elevator or installed one at the site.

12. On or about April 6, 2010, at Conspirator A's direction, RECARDO LEWIS submitted to the Bank a fraudulent construction draw request for $364,100. This draw request contained numerous false entries. For example, the spreadsheet attached to this draw request indicated that $35,000 was spent to purchase fire suppression materials. In fact, Tivest only ever paid the fire protection contractor $6,345 for materials purchased and work performed on the 24th Street condominium project. Moreover, Tivest did not make that payment until July 2010.

13. On or about May 6, 2010, at Conspirator A's direction, RECARDO LEWIS submitted to the Bank a fraudulent construction draw request for $268,890. This draw request contained numerous false entries. For example, the spreadsheet attached to this draw request indicated that $35,000 was spent on roofing and $45,000 was spent on a cornice for the building. In fact, Tivest only ever paid the roofing contractor $6,500. Moreover, the roofing contractor did

not perform any work at 24th Street until September 2010. Tivest also only made two payments totaling $12,000 for work on the building's cornice, and Tivest did not make those payments until July and August 2010.

14. On or about June 7, 2010, at Conspirator A's direction, RECARDO LEWIS submitted to the Bank a fraudulent construction draw request for $259,218.54. This draw request contained numerous false entries. For example, the spreadsheet attached to this draw request indicated that another $35,000 was spent on fire suppression and $20,000 was spent for masonry. But again, Tivest only ever paid the fire protection contractor $6,345. Tivest also only ever paid the masonry contractor $2,515.50 for work performed on the 24th Street condominium project.

15. On or about July 1, 2010, at Conspirator A's direction, RECARDO LEWIS submitted to the Bank a fraudulent construction draw request for $247,100. This draw request contained numerous false entries. For example, the spreadsheet attached to the draw request indicated that $25,000 was spent on exterior siding and trim, $25,000 was spent on flooring, and $12,500 was spent on ceramic tile. No such work was ever performed.

16. On or about August 5, 2010, at Conspirator A's direction, RECARDO LEWIS submitted to the Bank a fraudulent construction draw request for $226,100. This draw request contained numerous false entries. For example, the spreadsheet attached to the draw request indicated that $25,000 was spent on insulation, $40,000 was spent on drywall, $40,000 was spent on interior trim, and $12,500 was spent on painting. No such work was ever performed.

17. On or about September 1, 2010, at Conspirator A's direction, RECARDO LEWIS submitted to the Bank a fraudulent construction draw request for $251,704. This draw request contained numerous false entries. For example, the spreadsheet attached to the draw request indicated that $38,478 was spent on painting, $41,200 was spent on flooring, $18,500 was spent

on landscaping, and $4,000 was spent on a final clean of the condominium units. No such work was ever performed.

18. On or about September 28, 2010, at Conspirator A's direction, RECARDO LEWIS submitted to the Bank a fraudulent construction draw request for $221,849.38. This draw request contained numerous false entries. For example, the spreadsheet attached to the draw request indicated that $21,500 was spent on exterior siding and trim, $21,116 was spent on drywall, $22,225 was spent on interior trim, and $19,750 was spent on ceramic tile. No such work was ever performed.

19. In or about October 2010, the $4,111,000 loan was fully funded; however construction of the condominiums was only about 50 percent complete.

20. Conspirator B, a Bank employee, caused the Bank to fund all of these construction draws without verifying that the work was actually completed or the costs itemized in the draw requests were accurate.

21. Conspirator A used loan proceeds from each of these fraudulent construction draws to make payments on other loans at the Bank, to operate other businesses and for other personal purposes.

22. As a result of the conspiracy, in or about June 2011, the Bank charged off approximately $1,321,455 of the loan as a loss.

23. The 2011 city assessed value of the 24th Street property is $620,600.

The defendant acknowledges that the foregoing statement of facts does not describe all of his conduct relating to the offenses charged in this matter.

Neil H. MacBride
United States Attorney

By: /s/ Katherine Lee Martin / mee
Katherine Lee Martin
Assistant United States Attorney
United States Attorney's Office
Main Street Centre
600 E. Main Street, Suite 1800
Richmond, Virginia 23219-2447
Phone: (804) 819-5400
Fax: (804) 819-7417
katherine.martin@usdoj.gov

By: /s/ Melissa E. O'Boyle
Melissa E. O'Boyle
Assistant United States Attorney
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
Phone: (757) 441-6331
Fax: (757) 441-6689
melissa.oboyle@usdoj.gov

By: /s/ Uzo E. Asonye / mee
Uzo E. Asonye
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
Email: uzo.asonye@usdoj.gov

After consulting with my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
RECARDO S. LEWIS
Defendant

I am RECARDO S. LEWIS' attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Rodolfo Cejas
Counsel for the Defendant

7